UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:17-cv-507-RJC-DCK

AYMAN KAMEL,                              )
                                         )
            Plaintiff,                   )
                                         )
        v.                               )
                                         )
5CHURCH, INC., PATRICK WHALEN,           )
MAP MANAGEMENT OF CHARLOTTE,             )
LLC, and ALEJANDRO TORIO,                )
                                         )
            Defendants.                  )           ORDER
_____)
                                         )
5CHURCH INC., and 5CHURCH                )
CHARLESTON, LLC,                         )
                                         )
            Plaintiffs,                  )
                                         )
        v.                               )
                                         )
Ayman KAMEL,                             )
                                         )
            Defendant.                   )
_____)

   **THIS MATTER** comes before the Court on (1) 5Church, Inc., 5Church

Charleston, LLC, Patrick Whalen, MAP Management of Charlotte, LLC, and

Alejandro Torio's Motion for Summary Judgment, (Doc. No. 65); (2) Ayman Kamel's

Motion for Partial Summary Judgment, (Doc. No. 69); and (3) 5Church, Inc., 5Church

Charleston, LLC, Patrick Whalen, MAP Management of Charlotte, LLC, and

Alejandro Torio's Motion to Continue Trial Date, (Doc. No. 85).

## I.    BACKGROUND

   In a case that seems to prove the adage "never go into business with your

friends," this litigation arises out of a dispute between two friends and co-owners of several restaurant businesses. Ayman Kamel ("Kamel") and Patrick Whalen ("Whalen") met over ten years ago while working for a restaurant and night club in New York City. Kamel and Whalen became close friends and opened their own restaurant together in Charlotte, North Carolina. After the success of their first restaurant, they opened additional restaurants in Charlotte, Atlanta, Georgia, and Charleston, South Carolina. Ultimately, differences arose between Kamel and Whalen, and this litigation ensued. The record establishes, the parties agree, and/or the parties do not dispute the following.

### A. Kamel and Whalen's Pre-Existing Relationship

Kamel and Whalen are in the restaurant management business. Kamel began his career in 1996 as the owner of Napoli, an Italian restaurant in Manhattan, New York. (Doc. No. 70-1, at 10:1–6.) One to two years later, Kamel bought another Italian restaurant in Brooklyn, New York. (Id. at 14:3–25.) After the September 11 terrorist attacks caused both restaurants to close, Kamel joined The Cheesecake Factory at the end of 2002 as a manager. (Id. at 16:19–21, 20:1–16.) Soon thereafter, he was promoted to senior manager and then assistant general manager. (Id. at 23:18–24:1, 33:4.) By the middle of 2005, Kamel was frustrated that he had not been further promoted to general manager or Area Director of Operations ("ADO"), and Kamel left The Cheesecake Factory. (Id. at 45:8–13, 46:7–12, 96:20–23.)

Kamel and Whalen's relationship began in 2007 at Frames Bowling Lounge ("Frames"), a combined night club, bowling alley, and restaurant in New York City.

(Doc. No. 1, ¶ 11; Doc. No. 48, at 2 ¶ 11.)  Kamel, then the executive general manager of Frames, hired Whalen in June 2007 as a floor manager.  (Doc. No. 1, ¶ 12; Doc. No. 48, at 2 ¶ 12; Doc. No. 70-1, at 63:3–7.)  Kamel supervised Whalen's work at Frames, and the two became close friends.  (Doc. No. 1, ¶ 13; Doc. No. 48, at 2 ¶ 13; Doc. No. 70-1, at 96:14–20.)  During the two and one-half years that Kamel and Whalen worked together at Frames, Kamel repeatedly represented to Whalen that Kamel had significant experience in the restaurant industry.  (Doc. No. 48, at 11 ¶ 7; Doc. No 49, ¶ 7.)

## B.  Formation of the 5Church Companies

In December 2009, Whalen left Frames and moved to Charlotte, North Carolina where he took a job at a night club called Butter.  (Doc. No. 1, ¶ 13; Doc. No. 48, at 2 ¶ 13; Doc. No. 70-1, at 64:23–65:2.)  Kamel and Whalen remained in regular communication.  (Doc. No. 1, ¶ 16; Doc. No. 48, at 3 ¶ 16.)  Among other topics, Whalen told Kamel that he wanted to open a restaurant in Charlotte, and Whalen often sought Kamel's feedback on Whalen's restaurant plans.  (Doc. No. 1, ¶ 17; Doc. No. 48, at 3 ¶ 17; Doc. No. 70-12, at 63:4–64:14.)

On December 30, 2011, Whalen formed 5Church, Inc. ("5Church Charlotte"), a North Carolina corporation, for the purpose of operating a restaurant in Charlotte, North Carolina that opened on May 18, 2012.  (Doc. No. 62, ¶ 8; Doc. No. 63, ¶ 8.)  Whalen was the manager of 5Church Charlotte, and Kamel was a silent investor.  (Doc. No. 1, ¶ 20; Doc. No. 48, at 3 ¶ 20; Doc. No. 66-2, at 4.)  Kamel invested $100,000 in 5Church Charlotte in exchange for a 20% interest therein.  (Doc. No. 1, ¶ 22; Doc.

No. 48, at 3 ¶ 22.) MAP Management of Charlotte, LLC ("MAP") acquired a 60% interest in 5Church Charlotte. (Doc. No. 1, ¶ 24; Doc. No. 48, at 4 ¶ 24; Doc. No. 66-2, at Ex. A.) Whalen and Alejandro Torio ("Torio"), whom Whalen had worked with at Butter, owned membership interests in MAP, and Whalen was MAP's manager. (Doc. No. 1, ¶ 25; Doc. No. 48, at 4 ¶ 25.) Maurice Panzino ("Panzino") acquired the remaining 20% interest in 5Church Charlotte. (Doc. No. 66-2, at Ex. A.)

In connection with the formation of 5Church Charlotte, Whalen, Kamel, and Panzino executed an Operating Agreement. (Doc. No. 66-2.) Three provisions of the agreement are at issue in this litigation. First, section 3.12(a) of the agreement states that the members, officers, and directors "will not, directly or indirectly, invest in, own, control or participate in the ownership, management, operation, or control of, any [entity] engaged in or planning to become engaged in the Business anywhere within the . . . 25 mile radius from" the 5Church Charlotte restaurant. (Id. at § 3.12(a).) "Business" is defined as "the ownership and/or operation of a restaurant." (Id.) Restaurant is not defined in the agreement. Second, section 3.12(b) prohibits the members, officers, and directors from publicly disparaging the company or its members, managers, officers, employees, or agents. (Id. at § 3.12(b).) Third and last, section 3.12(c) provides the initial members with a right of first refusal to invest in the "second business to be opened after the commencement of this business[.]" (Id. at § 3.12(c).)

During the end of 2013, Whalen and Kamel opened a second restaurant in Charlotte called Nan & Byron's. (Doc. No. 70-2, at 30:3–8.) Kamel invested in Nan

& Byron's in exchange for a minority ownership interest.  (Id. at 30:9–17.)

In July 2013, Whalen contacted Kamel about an opportunity to open a new 5Church restaurant in Charleston, South Carolina and proposed that Kamel participate in the management of the new restaurant.  (Doc. No. 48, at 15 ¶ 31; Doc. No. 49, ¶ 31.)  Kamel moved from New York City to Charlotte in March 2014 to assist Whalen with Nan & Byron's and opening the new 5Church restaurant in Charleston. (Doc. No. 48, at 15 ¶ 32; Doc. No. 49, ¶ 32.)  Whalen and Kamel formed 5Church Charleston, LLC ("5Church Charleston"), a South Carolina limited liability company, on October 8, 2014 to operate the new 5Church restaurant in Charleston.  (Doc. No. 48, at 16 ¶ 35; Doc. No. 49, ¶ 35.)  The initial members in 5Church Charleston included Whalen and Kamel, who also served as co-managers.  (Doc. No. 21-4, at Ex. A.)  At some point, Torio also acquired a membership interest in 5Church Charleston. (Doc. No. 70-12, at 294:1–295:3.)  The Charleston restaurant opened on November 20, 2015, and Whalen moved to Charleston to focus on day-to-day management of the restaurant.  (Doc. No. 1, ¶ 40; Doc. No. 48, at 6 ¶ 40; Doc. No. 48, at 16 ¶ 35, at 20 ¶ 61; Doc. No. 49, ¶¶ 35, 61.)

Not long thereafter, 5Church expanded to Atlanta, Georgia.  Whalen and Kamel formed 5Church Atlanta, LLC ("5Church Atlanta"), a Georgia limited liability company, to operate the Atlanta restaurant.  (Doc. No. 48, at 16 ¶ 38; Doc. No. 49, ¶ 38.)  The initial members in 5Church Atlanta included Whalen and Kamel, who also served as co-managers.  (Doc. No. 21-5, at Ex. A.)  The Atlanta restaurant opened on June 24, 2016, and Kamel moved to Atlanta to focus on day-to-day management of

the restaurant.  (Doc. No. 1, ¶ 40; Doc. No. 48, at 6 ¶ 40.)

### C.    Kamel and Whalen's Relationship Deteriorates

Shortly after opening the 5Church Atlanta restaurant, the relationship between Kamel and Whalen began to deteriorate.  Kamel contacted Alex Pierce ("Pierce") at SLR Support, who provided IT support to the 5Church companies, and directed Pierce to forward emails addressed to Whalen's 5Church email address to Kamel's personal email address.  (Doc. No. 76-7, at 220:11–18.)  Kamel further directed Pierce to transfer the administrative rights to the 5Church email domains to Kamel.  (Id. at 216:9–11.)  From July 3 to December 1, 2016, there was an email forwarding rule in place on Whalen's 5Church email account pursuant to which Whalen's emails were automatically forwarded to Kamel's personal email address. (Doc. No. 76-9, ¶ 28.)

On December 1, 2016, an email to Whalen was automatically forwarded to Kamel pursuant to the forwarding rule but failed to deliver, and Whalen received a bounce back email stating that the email was not delivered to Kamel.  (Doc. No. 62-2.)  Whalen forwarded the bounce back email to Kamel and asked "[a]ny idea why my emails would be forwarding to your personal gmail account?"  (Id.)  Kamel never responded to Whalen's email.  (Doc. No. 76-2, at 216:1–3.)  Whalen contacted Pierce about the bounce back email, who said it was "fine" and "no big deal."  (Id. at 216:1–10.)  Whalen did not investigate further and assumed the bounce back email was due to a glitch in the system.  (Id. at 216:12–16.)

On April 21, 2017, Kamel exercised his buy-sell right under the deadlock

provision of the 5Church Atlanta Operating Agreement, forcing Whalen to sell his interest to Kamel and relinquish his manager position. (Doc. No. 70-8.) Whalen told Kamel that he was "heartbroken" and that he would never forgive Kamel. (Doc. No. 70-9.)

In or around May 2017, Whalen opened Sophia's Lounge, which is right next door to, and shares a wall with, 5Church Charlotte. (Doc. No. 1, ¶ 43; Doc. No. 48, at 6 ¶ 43.) Torio is also involved in the operation of Sophia's Lounge. (Doc. No. 66-9.) Sophia's Lounge serves wine, beer, craft cocktails, and food; however, it does not have a kitchen. (Doc. No. 1, ¶ 45; Doc. No. 48, at 6 ¶ 45; Doc. No. 71-1, at 233:14–234:2.) Instead, Whalen, on behalf of both Sophia's Lounge and 5Church Charlotte, executed a Service Agreement pursuant to which Sophia's Lounge used 5Church Charlotte's kitchen and resources to prepare food to be served at Sophia's Lounge. (Doc. No. 1, ¶ 46; Doc. No. 48, at 6 ¶ 46; Doc. No. 68-1.) Kamel contends that he was not offered the opportunity to invest in Sophia's Lounge, and that Sophia's Lounge is a restaurant in competition with 5Church Charlotte. (Doc. No. 1, ¶¶ 57, 59.)

Also in May 2017, Whalen contends that he first became aware that Kamel was never an ADO at The Cheesecake Factory. (Doc. No. 70-12, at 118:8–24; Doc. No. 70-15.) Based on this alleged misrepresentation, Whalen, on behalf of 5Church Charleston, terminated Kamel as co-manager. (Doc. No. 21-12.)

### D. The Instant Lawsuit

On August 22, 2017, Kamel filed this action against 5Church Charlotte, Whalen, MAP, and Torio (collectively, the "Defendants"). (Doc. No. 1.) Kamel asserts

the following claims: (1) breach of the 5Church Charlotte Operating Agreement against all Defendants; (2) breach of fiduciary duty against Whalen and MAP; (3) unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1 against Whalen and Torio; and (4) equitable accounting against 5Church Charlotte. (Id. at 8–10.)

On August 28, 2017, 5Church Charlotte and 5Church Charleston initiated a separate action against Kamel, Case No. 3:17-cv-00517-RJC-DCK, which was consolidated into this action on September 1, 2017. (Doc. No. 10.) In their Amended Complaint, 5Church Charlotte and 5Church Charleston assert the following claims: (1) violation of the North Carolina Securities Act; (2) fraud; (3) unfair or deceptive acts or practices and unfair methods of competition in violation of N.C. Gen. Stat. § 75-1.1; (4) computer trespass in violation of N.C. Gen. Stat. § 14-458; (5) violation of the Stored Communications Act ("SCA"); (6) conversion; (7) violation of the Computer Fraud and Abuse Act ("CFAA"); (8) breach of the duty of loyalty to 5Church Charleston; and (9) injunctive relief. (Doc. No. 62, at 22–30.)

On September 19, 2017, Whalen filed counterclaims against Kamel. (Doc. No. 21.) In his Second Amended Counterclaims, Whalen asserts claims for (1) fraud, and (2) violation of the North Carolina Securities Act. (Doc. No. 48, at 26–28.)

On May 15, 2019, Defendants moved for summary judgment on Kamel's claims, (Doc. No. 65), and Kamel moved for summary judgment on Whalen's counterclaims and 5Church Charlotte and 5Church Charleston's claims, (Doc. No. 69). Kamel and Defendants timely filed opposition and reply briefs. (Doc. Nos. 71,

74, 79–80.) On July 23, 2019, the Court held oral argument on the pending motions. Having been fully briefed and argued, these motions are now ripe for adjudication.

## II.    STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id. The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quotation marks omitted). This "burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." Id. at 325.

Once this initial burden is met, the burden shifts to the nonmoving party, which "must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250. The nonmoving party may not rely upon mere allegations or denials of allegations in the pleadings to defeat a motion for summary judgment; rather, it must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Id. at 248; accord Sylvia Dev. Corp. v. Calvert

Cty., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). The mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. Anderson, 477 U.S. at 248–49. "If the evidence is merely colorable or is not significantly probative," summary judgment is appropriate. Id. at 249–50 (citations omitted).

## III. DISCUSSION

### A. Defendants' Motion for Summary Judgment

Defendants move for summary judgment on Kamel's claims for breach of contract, breach of fiduciary duty, and violation of N.C. Gen. Stat. § 75-1.1. (Doc. No. 65.) Defendants do not move for summary judgment on Kamel's claim for an equitable accounting.

#### 1. Kamel's Breach of Contract Claim Against All Defendants

Kamel claims that Defendants breached three provisions of the 5Church Charlotte Operating Agreement: (1) section 3.12(a), the non-competition provision; (2) section 3.12(b), the non-disparagement provision; and (3) section 3.12(c), the right of first refusal provision. (Doc. No. 1, ¶¶ 57–59.) The Court addresses each alleged breach in turn.

*i.*     *Section 3.12(a)*

Kamel claims that Defendants breached section 3.12(a) by owning and operating Sophia's Lounge.  Section 3.12(a) prohibits the members, officers, and directors from investing in, owning, controlling, or participating in the management or operation of any entity engaged in or planning to become engaged in the ownership and/or operation of a restaurant.  (Doc. No. 66-2, § 3.12(a).)  Defendants argue that they are entitled to summary judgment on Kamel's claim for breach of section 3.12(a) for two reasons: (1) Kamel cannot establish damages as Sophia's Lounge benefits 5Church Charlotte, and (2) Sophia's Lounge is not a restaurant and, therefore, section 3.12(a) does not prohibit Defendants from owning or operating Sophia's Lounge.  (Doc. No. 67, at 8–10.)

Defendants are not entitled to summary judgment based on their contention that Kamel cannot establish damages.  Defendants agree that North Carolina law applies to the 5Church Charlotte Operating Agreement, but Defendants cite to a case from the Western District of Virginia applying Virginia law to support their argument that damages is an essential element of a breach of contract claim.  (Doc. No. 67, at 15.)  However, under North Carolina law, "[t]he elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract."  Poor v. Hill, 530 S.E.2d 838, 845 (N.C. Ct. App. 2000).  Contrary to Defendants' contention, North Carolina law is clear that "in a suit for damages for breach of contract, proof of the breach would entitle the plaintiff to nominal damages at least."  Delta Envtl. Consultants, Inc. v. Wysong & Miles Co., 510 S.E.2d 690, 698

(N.C. Ct. App. 1999); <u>Midgett v. N.C. State Highway Comm'n</u>, 144 S.E.2d 121, 124 (N.C. 1965) ("When plaintiff proves breach of contract he is entitled at least to nominal damages."); <u>Crescent Univ. City Venture, LLC v. AP Atl., Inc.</u>, 2019 NCBC LEXIS 46, at *127 (N.C. Super. Ct. Aug. 8, 2019) ("Under North Carolina law, proof of damages is not an element of a claim for breach of contract."); <u>see</u> <u>Brodkin v. Novant Health, Inc.</u>, 824 S.E.2d 868, 872 (N.C. Ct. App. 2019) ("To establish a breach of contract claim, there must be: (1) the existence of a valid contract and (2) a breach of a contractual term."). Accordingly, Kamel's alleged inability to prove damages is not a valid basis for granting summary judgment in favor of Defendants on his breach of contract claim.

Defendants also contend that they are entitled to summary judgment because Sophia's Lounge is not a restaurant within the meaning of section 3.12(a). (Doc. No. 67, at 8–10.) In so arguing, Defendants refer to various statutory definitions of the term "restaurant." (<u>Id.</u>) Kamel argues that reference to statutory definitions of "restaurant" in interpreting the parties' contract is improper, and Sophia's Lounge falls within the parties' intended meaning of "restaurant." (Doc. No. 71, at 2–5.)

"Whenever a court is called upon to interpret a contract its primary purpose is to ascertain the intention of the parties at the moment of its execution." <u>Premier, Inc. v. Peterson</u>, 755 S.E.2d 56, 59 (N.C. Ct. App. 2014) (quoting <u>Lane v. Scarborough</u>, 200 S.E.2d 622, 624 (N.C. 1973)). "[W]hen the terms of a contract are plain and unambiguous, there is no room for construction." <u>State v. Philip Morris USA Inc.</u>, 685 S.E.2d 85, 91 (N.C. 2009) (quotation marks omitted). "A contract that is plain

12

and unambiguous on its face will be interpreted by the court as a matter of law," Schenkel & Schultz, Inc. v. Hermon F. Fox & Assocs., P.C., 658 S.E.2d 918, 921 (N.C. 2008), and "the court cannot look beyond the terms of the contract to determine the intentions of the parties," Lynn v. Lynn, 689 S.E.2d 198, 205 (N.C. Ct. App. 2010). "When an agreement is ambiguous and the intention of the parties is unclear, however, interpretation of the contract is for the jury." Schenkel & Schultz, Inc., 658 S.E.2d at 921. Any undefined, "non-technical words are to be given their meaning in ordinary speech, unless the context clearly indicates another meaning was intended." Premier, Inc., 755 S.E.2d at 61. "A contract term is ambiguous only when, in the opinion of the court, the language of the contract is fairly and reasonably susceptible to either of the constructions for which the parties contend." Philip Morris USA Inc., 685 S.E.2d at 96 (brackets and quotation marks omitted).

Here, there is no evidence that the parties intended "restaurant" to have a meaning different than its ordinary meaning. Accordingly, the Court must give "restaurant" its ordinary meaning in construing section 3.12(a).

Defendants fail to cite any authority for this Court to look to definitions of "restaurant" set forth in otherwise inapplicable statutes to ascertain the term's ordinary meaning. Instead, "[i]n construing the ordinary and plain meaning of disputed terms, [the North Carolina Supreme Court] has used standard, nonlegal dictionaries as a guide." C. D. Spangler Constr. Co. v. Industrial Crankshaft & Eng'g Co., 388 S.E.2d 557, 568 (N.C. 1990) (quotation marks omitted); Premier, Inc., 755 S.E.2d at 61 (looking to Webster's New World Dictionary and The American Heritage

College Dictionary in determining the ordinary meaning of contractual terms "subscribed" and "licensed"); <u>Southpark Mall Ltd. P'ship v. CLT Food Mgmt.</u>, 544 S.E.2d 14, 16–17 (N.C. Ct. App. 2001) (looking to Webster's Third New International Dictionary, Black's Law Dictionary, and The American Heritage College Dictionary in determining the ordinary meaning of contractual terms "guest" and "day").

The American Heritage Dictionary of the English Language defines "restaurant" as "[a] place where meals are served to the public."[1] The American Heritage Dictionary of the English Language 1496 (5th ed. 2011). The definition requires only that the place be one where meals are served. It is undisputed that Sophia's Lounge serves food; however, the record before the Court is unclear as to the type and nature of the food served—i.e., whether Sophia's Lounge serves meals so as to render Sophia's Lounge a restaurant. Therefore, the Court concludes that there is a genuine dispute of material fact as to whether Sophia's Lounge is a "restaurant," and Defendants are not entitled to summary judgment on Kamel's claim for breach of section 3.12(a) of the 5Church Charlotte Operating Agreement.

### ii. *Section 3.12(b)*

Section 3.12(b) states that the members, officers, and directors of 5Church Charlotte shall not "publicly disparage" the company or its members, managers, officers, employees, or agents. (Doc. No. 66-2, § 3.12(b).) Defendants argue that they

---

[1] In addition, Webster's New World Dictionary defines "restaurant" as "a place where meals can be bought and eaten," Webster's New World Dictionary 1212 (2d ed. 1970), and Random House Webster's Unabridged Dictionary defines "restaurant" as "an establishment where meals are served to customers," Random House Webster's Unabridged Dictionary 1641 (2d ed. 2001).

are entitled to summary judgment on Kamel's claim for breach of section 3.12(b) because Kamel cannot establish that Defendants publicly disparaged Kamel.[2] (Doc. No. 67, at 12–14.) Kamel asserts that Defendants publicly disparaged Kamel by (1) Torio's April 5, 2017 Facebook post cropping Kamel out of the photograph; (2) Torio's July 26, 2017 email stating "sounds like an ex-girlfriend who doesn't want to break up"; (3) Whalen and Torio's suggestion, through facial expressions and body language, that a 5Church Charlotte hostess should not accept Kamel's invitation to attend a one-year anniversary party for 5Church Atlanta; (4) Torio's statement to his friend, Allen Chu ("Chu"), that Kamel would be unable to successfully operate 5Church Atlanta after Torio and Whalen departed; and (5) Torio's comment on Whalen's Instagram page that "Nan and Byron's worked but someone unqualified messed it up for us." (Doc. No. 71, at 8.)

As the parties' agreement does not define "disparage," the Court must give "disparage" its ordinary meaning in construing section 3.12(a). Premier, Inc., 755 S.E.2d at 61. The Court looks to standard, nonlegal dictionaries in construing the ordinary meaning of "disparage." C. D. Spangler Constr. Co., 388 S.E.2d at 568. The American Heritage Dictionary of the English Language defines "disparage" as "[t]o speak of in a slighting or disrespectful way" and "[t]o reduce in esteem or rank."[3] The

---

[2] Defendants also argue that they are entitled to summary judgment because Kamel cannot establish damages. (Doc. No. 67, at 14–15.) As discussed in Part III.A.1.i, supra, damages are not an essential element of a breach of contract claim.

[3] In addition, Random House Webster's Unabridged Dictionary defines "disparage" as "to speak of or treat slightingly; depreciate; belittle" and "to bring reproach or discredit upon; lower the estimation of." Random House Webster's Unabridged

American Heritage Dictionary of the English Language 520 (5th ed. 2011).

Applying these definitions, the Court concludes that Kamel has failed to come forward with sufficient evidence that Defendants publicly disparaged Kamel to create a genuine dispute of material fact. Torio's Facebook post, although public, did not disparage Kamel. In fact, the post did not even speak of or reference Kamel. (Doc. No. 66-11.) The post consisted of a photograph of Torio, Whalen, and chef Jamie Lynch. (Id.) The caption stated: "Sadly I'm saying goodbye to Atlanta. More news to come next week when I'm in town!" (Id.) That Torio cropped Kamel out of the photograph did not disparage Kamel. Likewise, Torio's comment on Whalen's Instagram page did not disparage Kamel for this same reason—it did not speak of or reference Kamel. (Doc. No. 71-9.) It merely stated: "Nan and Byron's worked but someone unqualified messed it up for us." (Id.)

In addition, Torio did not publicly disparage Kamel in his July 26, 2017 email. Whalen and Kamel had exchanged numerous emails in which they disputed various issues that are now the subject of this litigation. (Doc. No. 71-8.) In response to this exchange between Whalen and Kamel, Torio stated "lol sounds like an ex-girlfriend who doesn't want to break up." (Id.) Such a statement did not disparage Kamel—indeed, the end of a relationship between business partners is often analogized to a break-up. See, e.g., Neal A. Jacobs, Breaking Up Is Hard to Do: What Are Your Rights When Business Partners Decide to Split?, 7 Bus. Law Today 8, 8 (1998) ("Business divorces can be just as emotionally wrenching and financially disruptive as a marital

_____

Dictionary 567 (2d ed. 2001).

divorce."). Moreover, Torio's email was only sent to Whalen, Kamel, chef Jamie Lynch, Mills Howell (an investor in 5Church Charleston), Whalen's parents, and Whalen's attorney. (Id.; Doc. No. 66-3, at 189:1–19.) Thus, even assuming *arguendo* that Torio's statement amounts to disparagement, a statement to the 5Church companies' investors and the manager's parents and attorney is not public. For this same reason, Whalen and Torio's suggestion to a 5Church Charlotte hostess does not constitute a breach of section 3.12(b)—it was not public.

Last, Kamel claims that Torio told his friend, Chu, that Kamel would be unable to successfully operate 5Church Atlanta after Torio and Whalen departed. (Doc. No. 71, at 8.) The evidence of record, however, is that Chu, not Torio, made the statement. (Doc. No. 71-2, at 193:8–22.)

Accordingly, the Court concludes that Kamel has failed to come forward with sufficient evidence that Defendants publicly disparaged Kamel to create a genuine dispute of material fact, and summary judgment in favor of Defendants on Kamel's claim for breach of section 3.12(b) is appropriate.

### iii.    Section 3.12(c)

Kamel claims that Defendants breached section 3.12(c) by failing to offer Kamel an opportunity to invest in Sophia's Lounge. (Doc. No. 71, at 10–13.) Section 3.12(c) provides the initial members of 5Church Charlotte with a right of first refusal to invest in the "second business to be opened after the commencement of this business[.]" (Doc. No. 66-2, § 3.12(c).) Defendants argue that they are entitled to summary judgment on Kamel's claim for breach of section 3.12(c) because Sophia's

Lounge was not the "second business" within the meaning of section 3.12(c). (Doc. No. 67, at 15–16.) Kamel, relying on extrinsic evidence, argues that the parties intended the right of first refusal to apply to all future restaurant businesses. (Doc. No. 71, at 11–13.)

The Court concludes as a matter of law that Kamel did not have a right of first refusal to invest in Sophia's Lounge because it was not the "second business" opened after 5Church Charlotte. As explained above, "when the terms of a contract are plain and unambiguous, there is no room for construction." Philip Morris USA Inc., 685 S.E.2d at 91 (quotation marks omitted). "A contract that is plain and unambiguous on its face will be interpreted by the court as a matter of law," Schenkel & Schultz, Inc., 658 S.E.2d at 921, and "the court cannot look beyond the terms of the contract to determine the intentions of the parties," Lynn, 689 S.E.2d at 205. Section 3.12(c) is plain and unambiguous. The ordinary meaning of "second" is "[c]oming next after the first in order, place, rank, time, or quality."[4] The American Heritage Dictionary of the English Language 1582 (5th ed. 2011). The evidence of record is undisputed that after opening 5Church Charlotte, the initial investment group next opened Nan & Byron's—in fact, Kamel testified twice that "Nan & Byron's is the second restaurant [they] opened in Charlotte right after 5Church Charlotte." (Doc. No. 70-2, at 30:3–4; Doc. No. 66-2, at 202:10–11 ("[Their] second restaurant that [they] opened was Nan and Byron's.").) The evidence is also undisputed that Kamel was

_____

[4] See also Random House Webster's Unabridged Dictionary 1729 (2d ed. 2001) (defining "second" as "next after the first in place, time, or value").

offered an opportunity to, and did in fact, invest in Nan & Byron's. (Doc. No. 70-2, at 30:9–17.) Therefore, Kamel has failed to come forward with sufficient evidence that Defendants breached section 3.12(c), and summary judgment in favor of Defendants is appropriate.

### 2. Kamel's Breach of Fiduciary Duty Claim Against Whalen and MAP

Kamel claims that Whalen and MAP breached their fiduciary duties to Kamel by mismanaging and misappropriating 5Church Charlotte funds for the benefit of Sophia's Lounge. (Doc. No. 71, at 13–15.) Whalen and MAP argue that they are entitled to summary judgment for two reasons: (1) Kamel lacks standing to bring this claim, and (2) Kamel has failed to establish any mismanagement or misappropriation. (Doc. No. 67, at 17–22.)

#### i. *Kamel's Standing*

Under North Carolina law, shareholders of a corporation "may not bring individual actions to recover what they consider their share of the damages suffered by the corporation." Green v. Freeman, 749 S.E.2d 262, 268 (N.C. 2013). There are two exceptions to this rule: (1) when the wrongdoer owed the shareholder a special duty, and (2) when the shareholder suffered an injury separate and distinct from the injury suffered by the corporation. Corwin v. British Am. Tobacco PLC, 821 S.E.2d 729, 734 (N.C. 2018).

Kamel argues that he has standing to bring his claim under the special duty exception. (Doc. No. 71, at 14.) Specifically, Kamel argues that Whalen, as the manager of 5Church Charlotte, and MAP, as the majority owner of 5Church

Charlotte, owe fiduciary duties to Kamel, a minority shareholder. (Id.)

The special duty exception applies when the wrongdoer "owed a duty to plaintiffs that was personal to plaintiffs as shareholders and was separate and distinct from the duty defendant[] owed the corporation." Barger v. McCoy Hillard & Parks, 488 S.E.2d 215, 220 (N.C. 1997). When the wrongdoer owed the shareholder a fiduciary duty, the shareholder has standing to bring an individual claim under the special duty exception. See Corwin, 821 S.E.2d at 734 (stating that whether plaintiff had standing under the special duty exception depended on whether defendant owed plaintiff fiduciary duties); Barger, 488 S.E.2d at 220 (listing a fiduciary duty as an example of a special duty).

Here, Kamel has standing under the special duty exception to bring an individual claim for breach of fiduciary duty against MAP. "[T]he majority stockholder of a corporation owes fiduciary duties to the minority stockholders." Corwin, 821 S.E.2d at 737. MAP is the majority owner of 5Church Charlotte and, thus, owes fiduciary duties to Kamel, a minority owner.[5]

Kamel does not, however, have standing to bring an individual claim for breach of fiduciary duty against Whalen. Contrary to Kamel's contention, Whalen, as

---

[5] During oral argument, Defendants' counsel raised—for the first time—that MAP was sold to a third party prior to the opening of Sophia's Lounge. Defendants' counsel argued that the sale of MAP was fatal to Kamel's breach of fiduciary duty claim. The ownership of MAP, however, is distinct from MAP's ownership of 5Church Charlotte. To put it another way, regardless of whether Whalen and Torio sold their interests in MAP to a third party, there is no evidence in the record that MAP sold its interest in 5Church Charlotte such that it is no longer the majority owner of 5Church Charlotte. Moreover, the parties have judicially admitted that Whalen is the manager of MAP and Whalen and Torio are members of MAP. (Doc. No. 1, ¶ 25; Doc. No. 48, at 4 ¶ 25.)

manager, does not owe fiduciary duties to Kamel. Directors of a corporation owe fiduciary duties to the corporation, rather than to the shareholders. Kaplan v. O.K. Techs., L.L.C., 675 S.E.2d 133, 137 (N.C. Ct. App. 2009). Accordingly, "where it is alleged that directors have breached [their fiduciary duties], the action is properly maintained by the corporation rather than any individual creditor or stockholder." Governor's Club Inc. v. Governor's Club Ltd. P'ship, 567 S.E.2d 781, 786–87 (N.C. Ct. App. 2002). Kamel did not offer any other basis for finding a special duty or argue that the special injury exception applies. As a result, Kamel lacks standing to bring a breach of fiduciary duty claim against Whalen.

### ii.    Kamel's Breach of Fiduciary Duty Claim Against MAP

"To establish a claim for breach of fiduciary duty, a plaintiff must show that: (1) the defendant owed the plaintiff a fiduciary duty; (2) the defendant breached that fiduciary duty; and (3) the breach of fiduciary duty was a proximate cause of injury to the plaintiff." Sykes v. Health Network Sols., Inc., 828 S.E.2d 467, 475 (N.C. 2019).

Defendants argue that they are entitled to summary judgment because Kamel has failed to establish any mismanagement or misappropriation. (Doc. No. 67, at 19–22.) Kamel hired Stephanie O'Rourk, a CPA and partner in the accounting and advisory firm CohnReznick LLP, to review the deposition testimony of 5Church Charlotte's accountant and documents disclosed by Defendants and 5Church Charlotte vendors. (See generally Doc. No. 66-13.) Kamel submitted an affidavit of O'Rourk in which she stated that "[b]ased on the above-average beverage cost and the timing of beverage purchases at the time of the opening of Sophia's Lounge, there

is a strong likelihood that 5Church Charlotte made beverage purchases for the benefit of Sophia's Lounge." (Doc. No. 71-16, ¶ 4.) O'Rourk further stated that "[t]here can be no question that 5Church Charlotte's use of comps in 2016 and 2017 was dramatically above the industry average as well as being in excess of what was allowable per management's policy, which indicates mismanagement." (Id. at ¶ 6.)

Viewing the evidence in the light most favorable to Kamel—as the Court must in considering Defendants' Motion for Summary Judgment—Kamel has come forward with sufficient evidence of mismanagement and misappropriation to create a genuine dispute of material fact. Therefore, MAP is not entitled to summary judgment on Kamel's claim for breach of fiduciary duty.

3.   Kamel's Claim Against Whalen and Torio Under N.C. Gen. Stat. § 75-1.1

Kamel claims that Whalen and Torio breached their fiduciary duties as controlling shareholders of 5Church Charlotte and thereby committed an unfair or deceptive act or practice in violation of N.C. Gen. Stat. § 75-1.1. (Doc. No. 71, at 16.)

"[I]n order to establish a violation of [section 75-1.1], a plaintiff must show: (1) an unfair or deceptive act or practice, (2) in or affecting commerce, and (3) which proximately caused injury to plaintiffs." Walker v. Fleetwood Homes of N.C., Inc., 653 S.E.2d 393, 399 (N.C. 2007). "'Commerce' includes all business activities, however denominated, but does not include professional services rendered by a member of a learned profession." N.C. Gen. Stat. § 75-1.1(b). "'Business activities' is a term which connotes the manner in which businesses conduct their regular, day-to-day activities, or affairs, such as the purchase and sale of goods, or whatever other

activities the business regularly engages in and for which it is organized." Hajmm

Co. v. House of Raeford Farms, Inc., 403 S.E.2d 483, 493 (N.C. 1991). "[T]he General

Assembly intended [section 75-1.1]'s provisions to apply to interactions between

market participants. As a result, any unfair or deceptive conduct contained solely

within a single business is not covered by [section 75-1.1]." White v. Thompson, 691

S.E.2d 676, 680 (N.C. 2010). "[W]hen the unfair or deceptive conduct alleged only

affects relationships within a single business or market participant, and not dealings

with other market participants, that conduct is not 'in or affecting commerce' within

the meaning of Section 75-1.1, even if other market participants may be indirectly

involved in the unfair or deceptive acts." Powell v. Dunn, 2014 NCBC LEXIS 3, at *9

(N.C. Super. Ct. Jan. 28, 2014) (citing White, 691 S.E.2d at 680).

Here, Kamel's claim is based on alleged mismanagement and misappropriation

of the funds of a single market participant, 5Church Charlotte. That Whalen and

Torio may have misappropriated 5Church Charlotte funds for the benefit of Sophia's

Lounge "does not change the fundamental character of the dispute" because any

unfairness in these actions lies in the relationship between Kamel, Whalen, and Torio

as co-owners and officers of 5Church Charlotte. Potts v. KEL, LLC, 2018 NCBC

LEXIS 24, at *15 (N.C. Super. Ct. Mar. 27, 2018); White, 691 S.E.2d at 680

(concluding that defendant's conduct in diverting partnership opportunities to

another business was not in or affecting commerce "[b]ecause [defendant] unfairly

and deceptively interacted only with his partners" and thus "his conduct occurred

completely within [the partnership]"); Alexander v. Alexander, 792 S.E.2d 901, 906

(N.C. Ct. App. 2016) (holding that defendant's misappropriation of corporate funds through payments he caused the company to make to his family and friends was not in or affecting commerce). "The involvement of [Sophia's Lounge] was merely incidental to what is, at bottom, an intra-company dispute," Potts, 2018 NCBC LEXIS 24, at *16, and "section 75-1.1 plays no role in resolving these internal corporate disputes," Brewster v. Powell Bail Bonding, Inc., 2018 NCBC LEXIS 76, at *17 (N.C. Super. Ct. July 26, 2018). Accordingly, Defendants are entitled to summary judgment on Kamel's claim under section 75-1.1.[6]

## B.  Kamel's Motion for Summary Judgment

Kamel moves for summary judgment on Whalen's counterclaims and 5Church Charlotte and 5Church Charleston's claims.[7] (Doc. No. 69.) For purposes of this Part III.B, 5Church Charlotte and 5Church Charleston are collectively referred to as "5Church."

### 1.  Whalen's Counterclaim and 5Church's Claim for Fraud

Whalen and 5Church claim that Kamel fraudulently misrepresented that he was an ADO at The Cheesecake Factory and, in reliance on this misrepresentation, Whalen and 5Chuch allowed Kamel to purchase an ownership interest and

---

[6] Although Defendants do not argue that Kamel's section 75-1.1 claim was based solely on conduct occurring within 5Church Charlotte, Kamel makes this argument in support of his motion for summary judgment on 5Church Charlotte and 5Church Charleston's claim under section 75-1.1. As discussed in Part III.B.3, infra, 5Church Charlotte and 5Church Charleston's section 75-1.1 claim also fails for this same reason.

[7] As Kamel moves for summary judgment on all claims asserted against him, it is unclear why Kamel styled his motion as a motion for partial summary judgment.

participate in 5Church. (Doc. No. 48, at 26–28; Doc. No. 62, at 23–24.) Kamel argues that he is entitled to summary judgment because Whalen and 5Church cannot establish detrimental reliance. (Doc. No. 70, at 13–14.)

Although it is undisputed that Kamel was never an ADO at The Cheesecake Factory, (Doc. No. 70-1, at 78:25–79:4), there is a genuine dispute as to whether Kamel misrepresented this fact to Whalen. For purposes of Kamel's motion for summary judgment, however, the Court assumes that Kamel made such a misrepresentation.

To establish a claim for fraud, the claimant must show "(1) a false representation or concealment of a material fact (2) that is reasonably calculated to deceive (3) made with intent to deceive (4) which does in fact deceive and (5) results in damage to the injured party." <u>Charlotte Motor Speedway, LLC v. Cty. of Cabarrus</u>, 748 S.E.2d 171, 178 (N.C. Ct. App. 2013). The "does in fact deceive" element means that a claimant must show "reliance on the misrepresentation to the [claimant]'s detriment[.]" <u>In re Rutledge</u>, 510 B.R. 491, 505 (Bankr. M.D.N.C. 2014).

Whalen and 5Church have failed to come forward with sufficient evidence of detrimental reliance to create a genuine dispute of material fact. Although Whalen and 5Church claim that they relied on Kamel's misrepresentation that he was an ADO, the record is devoid of evidence to support this assertion. Instead, the evidence shows that Kamel had significant experience in the restaurant management industry prior to becoming involved in 5Church—notwithstanding that he was not an ADO— and Whalen and 5Church allowed Kamel to invest in and participate in 5Church

because of his experience and his professional relationship with Whalen. Indeed, Whalen testified that a number of factors influenced his decision to allow Kamel to invest in 5Church, including: Whalen viewed Kamel as a mentor, (Doc. No. 70-12, at 116:7–10); Kamel had $100,000 in capital to invest, (id. at 117:3–6); Kamel was someone whom Whalen sought out for advice on business issues, (id. at 117:7–12); out of all the original investors, Kamel had the most restaurant industry experience, (id. at 117:13–19); and Kamel's knowledge and experience at Frames, where Whalen worked under Kamel for two and one-half years, (id. at 117:20–118:1). Moreover, it is undisputed that Kamel was merely a silent investor in 5Church for the first two years of its existence—to which Kamel's alleged experience as an ADO is irrelevant. (Doc. No. 1, ¶ 20; Doc. No. 48, at 3 ¶ 20; Doc. No. 70-13, at 143:10–12.)

Accordingly, the Court concludes that Whalen and 5Church have failed to come forward with sufficient evidence of an essential element of their fraud claims, and summary judgment in favor of Kamel is appropriate.

2.    <u>Whalen's Counterclaim and 5Church's Claim Under the North Carolina Securities Act</u>

Whalen and 5Church claim that Kamel violated N.C. Gen. Stat. § 78A-56(b) by misrepresenting that he was an ADO at The Cheesecake Factory in connection with his purchase of 5Church securities. (Doc. No. 48, at 28–29; Doc. No. 62, at 22–23.) Whalen's claim is based on Kamel's purchase of Whalen's interest in 5Church Atlanta, and 5Church's claim is based on Kamel's purchase of interests in 5Church Charlotte and 5Church Charleston. (Doc. No. 48, at 28–29; Doc. No. 62, at 22–23.) Whalen claims that Kamel's misrepresentation enabled Kamel to purchase

ownership interests in the 5Church entities, which led to Kamel's purchase of Whalen's interest in 5Church Atlanta. (Doc. No. 74, at 25.) Kamel argues that he is entitled to summary judgment because the alleged misrepresentation was not material. (Doc. No. 70, at 10–12.) As with the fraud claims, the Court assumes for purposes of Kamel's motion for summary judgment that Kamel misrepresented that he was an ADO at The Cheesecake Factory.

Under section 78A-56(b), "[a]ny person who purchases a security by means of any untrue statement of a material fact or any omission to state a material fact . . . shall be liable to the person selling the security to him[.]" N.C. Gen. Stat. § 78A-56(b); see also Sullivan v. Mebane Packaging Grp., Inc., 581 S.E.2d 452, 463 (N.C. Ct. App. 2003). In interpreting the North Carolina Securities Act, North Carolina courts "use federal courts' interpretation of analogous federal actions as persuasive authority." Piazza v. Kirkbride, 785 S.E.2d 695, 708 (N.C. Ct. App. 2016). A claim under section 78A-56(b) requires the claimant to "show that the statements were misleading as to a material fact. It is not enough that a statement is false or incomplete, if the misrepresented fact is otherwise insignificant." See Basic Inc. v. Levinson, 485 U.S. 224, 238 (1988) (discussing a claim under Rule 10b-5, which is analogous to section 78A-56(b)). "[A] fact stated or omitted is material if there is a substantial likelihood that a reasonable purchaser or seller of a security (1) would consider the fact important in deciding whether to buy or sell the security or (2) would have viewed the total mix of information made available to be significantly altered by disclosure of the fact." SEC v. Pirate Investor LLC, 580 F.3d 233, 240 (4th Cir.

2009) (alteration in original) (quoting <u>Longman v. Food Lion, Inc.</u>, 197 F.3d 675, 683 (4th Cir. 1999)). "[M]ateriality is a 'mixed question of law and fact,'" but "[n]o shortage of cases . . . make clear that materiality may be resolved by a court as a matter of law." <u>Greenhouse v. MCG Capital Corp.</u>, 392 F.3d 650, 657 (4th Cir. 2004) (quoting <u>TSC Indus., Inc. v. Northway, Inc.</u>, 426 U.S. 438, 540 (1976)). In assessing the materiality of a misrepresentation, the Court must "decide whether a reasonable jury could find it 'substantially likely' that a reasonable investor would believe that the disclosure of the untrue fact(s) (and nothing but the disclosure of the untrue fact(s)) would alter the 'total mix' of information available to a reasonable investor." <u>Id.</u>

The Court concludes as a matter of law that Kamel's misrepresentation that he was an ADO at The Cheesecake Factory was not a misrepresentation of a material fact. With respect to Kamel's purchase of 5Church Charlotte shares, the "total mix" of information includes: Kamel had $100,000 in capital to invest, (Doc. No. 70-12, at 117:3–6); Kamel had significant experience in the restaurant management industry prior to becoming involved in 5Church, (Doc. No. 70-1, at 10:1–6, 14:3–25, 16:19–21, 20:1–16, 23:18–24:1, 33:4); out of all the original investors, Kamel had the most restaurant industry experience, (Doc. No. 70-12, at 117:13–19); and Kamel invested as a silent investor, (Doc. No. 1, ¶ 20; Doc. No. 48, at 3 ¶ 20; Doc. No. 70-13, at 143:10–12). No reasonable jury could find it substantially likely that a reasonable investor would view the total mix of information as significantly altered by the allegedly false assertion by Kamel of his prior position as ADO of The Cheesecake Factory. <u>See</u>

Greenhouse, 392 F.3d at 657.

Kamel's misrepresentation is even less material to his purchase of 5Church Charleston shares. Kamel purchased an interest in 5Church Charleston in or around October 2014—almost five years after Kamel misrepresented that he was an ADO, more than two years after the opening of the 5Church Charlotte restaurant, and approximately one year after the opening of Nan & Byron's. (Doc. No. 48, at 16 ¶¶ 35–37; Doc. No. 49, ¶¶ 35–37; Doc. No. 62, ¶ 8; Doc. No. 63, ¶ 8; Doc. No. 70-2, at 30:5–8.) It would be nonsensical for a reasonable investor to view the total mix of information as significantly altered by disclosure of the untrue fact that—seven years earlier—Kamel was an ADO at The Cheesecake Factory. In other words, "if one imagines a parallel universe of affairs where the one and only thing different was that [Kamel never represented that he was an ADO at The Cheesecake Factory], we find it incredible to believe that" a reasonable investor would view the total mix of information as significantly altered. See Greenhouse, 392 F.3d at 661.

As Whalen and 5Church have failed to come forward with evidence of a misrepresentation of material fact, Kamel is entitled to summary judgment on Whalen's and 5Church's claims under the North Carolina Securities Act.[8]

3.    5Church's Claim Under N.C. Gen. Stat. § 75-1.1

5Church claims that Kamel engaged in unfair or deceptive acts or practices

---

[8] Having concluded that Whalen failed to present evidence of a misrepresentation of a material fact, the Court need not consider Kamel's additional argument that the misrepresentation was not made in connection with Kamel's purchase of Whalen's interest in 5Church Atlanta.

and unfair methods of competition in violation of N.C. Gen. Stat. § 75-1.1 by implementing the email forwarding rule and improperly taking the administrative rights to 5Church's email domains. (Doc. No. 62, at 25–26.) Kamel argues that he is entitled to summary judgment because the alleged conduct was not in or affecting commerce. (Doc. No. 70, at 7–9.)

As previously stated, "in order to establish a violation of [section 75-1.1], a [claimant] must show: (1) an unfair or deceptive act or practice, (2) in or affecting commerce, and (3) which proximately caused injury to [claimant]." Walker, 653 S.E.2d at 399. "'Commerce' includes all business activities," N.C. Gen. Stat. § 75-1.1(b), and "'[b]usiness activities' is a term which connotes the manner in which businesses conduct their regular, day-to-day activities, or affairs, such as the purchase and sale of goods, or whatever other activities the business regularly engages in and for which it is organized," Hajmm Co., 403 S.E.2d at 493. Section 75-1.1 does not apply to internal corporate disputes even if other market participants are indirectly involved in the unfair or deceptive acts. White, 691 S.E.2d at 680; Alexander, 792 S.E.2d at 906; Potts, 2018 NCBC LEXIS 24, at *15–16; Powell, 2014 NCBC LEXIS 3, at *9.

5Church's claim under section 75-1.1 fails for the same reason that Kamel's section 75-1.1 claim fails—it is based on conduct occurring solely within 5Church and, thus, is not in or affecting commerce. Just as the involvement of Sophia's Lounge was merely incidental to the conduct underlying Kamel's claim, the involvement of Pierce at SLR Support in transferring the administrative rights to the email domains

to Kamel and implementing the email forwarding rule was likewise incidental to this purely internal corporate dispute between Kamel and Whalen as co-owners of 5Church. Therefore, Kamel is entitled to summary judgment on 5Church's claim under section 75-1.1.

4. 5Church's Claim for Computer Trespass

5Church claims that Kamel violated N.C. Gen. Stat. § 14-458 by taking the administrative rights to 5Church's email domains and implementing the email forwarding rule pursuant to which 5Church employees' emails were automatically forwarded to Kamel's personal email address. (Doc. No. 62, at 26–27.) Kamel argues that he is entitled to summary judgment because his actions were authorized. (Doc. No. 70, at 16–17.)

> Section 14-458 makes it unlawful
>
> for any person to use a computer or computer network without authority and with the intent to do any of the following:
>
> (1) Temporarily or permanently remove, halt, or otherwise disable any computer data, computer programs, or computer software from a computer or computer network.
>
>  . . . .
>
> (5) Make or cause to be made an unauthorized copy, in any form, including, but not limited to, any printed or electronic form of computer data, computer programs, or computer software residing in, communicated by, or produced by a computer or computer network."

N.C. Gen. Stat. § 14-458(a). The statute defines "without authority" to mean "the person has no right or permission of the owner to use a computer, or the person uses a computer in a manner exceeding the right or permission[.]" Id. The statute

provides a private right of action for "[a]ny person whose property or person is injured by reason of a violation[.]" Id. § 14-458(c).

The Court cannot conclude as a matter of law that Kamel had the authority to take the administrative rights to the 5Church email domains or forward 5Church employees' emails to his personal email address. Kamel cites no authority to support his argument that he was authorized to take these actions as a co-manager of 5Church Charleston. And although Kamel contends that his actions were authorized as a co-owner of the 5CHURCH™, the cases on which he relies are inapposite. (Doc. No. 70, at 16.) That a domain name using a trademark can support a trademark infringement claim is wholly unrelated to the issue of whether a co-owner of a trademark can take the administrative rights to company domain names authorized to use the trademark. See Gizmo Beverages, Inc. v. Park, No. 8:17-cv-01037, 2019 U.S. Dist. LEXIS 4270 (C.D. Cal. Jan. 9, 2019); Stephens v. Trump Org. LLC, 205 F. Supp. 3d 305 (E.D.N.Y. 2016). Accordingly, Kamel is not entitled to summary judgment on 5Church's computer trespass claim.

### 5. 5Church's Claim Under the SCA

Similar to its computer trespass claim, 5Church's SCA claim is based on Kamel taking the administrative rights to the 5Church email domains and implementing the email forwarding rule. (Doc. No. 62, at 27.)

"Section 2701 of the SCA creates a criminal offense for whoever 'intentionally accesses without authorization a facility through which an electronic communication service is provided' or 'intentionally exceeds an authorization to access that facility,'

and by doing so 'obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage in such system.'" Van Alstyne v. Elec. Scriptorium, Ltd., 560 F.3d 199, 204 (4th Cir. 2009) (quoting 18 U.S.C. § 2701(a)(1)– (2)). Section 2707 provides a private right of action for "any . . . person aggrieved" by a violation of section 2701. 18 U.S.C. § 2707(a).

Kamel first argues that he is entitled to summary judgment because his actions were authorized. (Doc. No. 70, at 19–20.) As discussed above, the Court cannot conclude as a matter of law that Kamel had the authority to take the administrative rights to the 5Church email domains or forward 5Church employees' emails to his personal email address.

Kamel next argues that the claim is time-barred. (Id. at 20.) A claim for violation of the SCA "may not be commenced later than two years after the date upon which the claimant first discovered or had a reasonable opportunity to discover the violation." 18 U.S.C. § 2707(f). "In other words, the limitations period begins to run when the [claimant] discovers that, or has information that would motivate a reasonable person to investigate whether, someone has intentionally accessed the 'facility through which an electronic communication service is provided' and thereby obtained unauthorized access to a stored electronic communication.'" Sewell v. Bernardin, 795 F.3d 337, 340 (2d Cir. 2015) (quoting 18 U.S.C. § 2701(a)).

Here, Whalen had a reasonable opportunity to discover that Kamel intentionally accessed the facility through which his 5Church account sends and receives emails on December 1, 2016 when he received a bounce back email stating

that an email he received—and never sent to Kamel—was not delivered to Kamel's personal email address. (Doc. No. 62-2.) That same day, Whalen forwarded the bounce back email to Kamel and asked "[a]ny idea why my emails would be forwarding to your personal gmail account?" (Id.) Thus, Whalen was put on notice that his emails were being forwarded to Kamel's personal email address. Such information "would motivate a reasonable person to investigate whether[] someone has intentionally accessed the 'facility through which an electronic communication service is provided' and thereby obtained unauthorized access to a stored electronic communication.'" Sewell, 795 F.3d at 340. Whalen had further reason to investigate the issue after Kamel did not respond to Whalen's email asking why his emails would be forwarding to Kamel's personal email address. (Doc. No. 76-2, at 216:1–3.) Although Whalen contacted Pierce, 5Church's IT support, and Pierce said it was "fine" and "no big deal," Whalen was on notice "that something was afoot." Steinbach v. Forest Park, No. 06 C 4215, 2009 U.S. Dist. LEXIS 85442, at *4 (N.D. Ill. Aug. 5, 2009). Indeed, Whalen testified that "Kamel under no circumstances should have had any of [Whalen's] e-mails forwarded to him." (Doc. No. 70-12, at 215:17–18.) Whalen also admitted that he could have investigated further but chose not to. (Id. at 217:5–14.)

Therefore, insofar as 5Church's claim is based on the email forwarding rule, Whalen had a reasonable opportunity to discover the violation as of December 1, 2016. 5Church did not seek to amend its pleading to add the email forwarding rule as a basis for its SCA claim until February 7, 2019, more than two years later. (Doc.

34

No. 54.) As a result, to the extent that 5Church's SCA claim is based on Kamel's implementation of the email forwarding rule, the claim is barred by the two-year statute of limitations, and summary judgment in favor of Kamel is appropriate.

Last, Kamel argues that 5Church is precluded from recovering statutory damages because 5Church has not presented sufficient evidence of actual damages. (Doc. No. 70, at 21.) The Fourth Circuit has held that actual damages are a prerequisite to recovery of statutory damages under the SCA. <u>Van Alstyne</u>, 560 F.3d at 206. In response, 5Church argues that it has presented sufficient evidence of actual damages, pointing to the damages sustained as a result of Kamel's email forwarding rule. (Doc. No. 74, at 22.) As the SCA claim is time-barred to the extent it is based on the email forwarding rule, 5Church must come forward with sufficient evidence of actual damages from Kamel taking the administrative rights to the 5Church email domains in order to be entitled to statutory damages. 5Church has failed to do so.

"[T]he actual damages requirement is more rigorous than requiring an injury in fact or an adverse effect." <u>Global Policy Partners, LLC v. Yessin</u>, 686 F. Supp. 2d 642, 654 (E.D. Va. 2010) (quotation marks omitted). 5Church "must show that [it] ha[s] suffered some concrete, compensable harm as a result of [Kamel's] alleged SCA violations." <u>Id.</u> The only evidence of actual damages from Kamel's seizure of the email domains is Whalen's testimony that 5Church "had to pay to transfer [the] entire e-mail server to CloudScale," 5Church "had to seek consultants to identify . . . what the problem was prior to litigation," 5Church "had to allocate many man-hours . . . to

try and untangle this web," and 5Church "may have had to buy some new equipment[.]" (Doc. No. 76-2, at 198:3–199:1, 199:20–200:21.) When asked whether he could quantify these damages, Whalen testified it "was probably around $20,000." (Doc. No. 76-2, at 201:5–8.) Whalen said he arrived at $20,000 by going through 5Church's damages, "list of equipment, any billing that [he] got from third-party vendors, and [he] tried to accumulate it all together and came up with that number." (Id. at 201:9–14.) This is insufficient to prove actual damages and, therefore, 5Church is not entitled to statutory damages.

Although actual damages are a prerequisite to recovery of statutory damages, proof of actual damages is not required to recover attorney's fees under the SCA. Van Alstyne, 560 F.3d at 209; Hately v. Torrenzano, No. 1:16-cv-01143, 2017 U.S. Dist. LEXIS 80011, at *26 (E.D. Va. May 23, 2017) (denying defendant's motion for summary judgment on plaintiff's SCA claim because plaintiff may have been entitled to attorney's fees even though plaintiff could not establish actual damages); Hoofnagle v. Smyth-Wythe Airport Comm'n, No. 1:15-cv-00008, 2016 U.S. Dist. LEXIS 67723, at *34 (W.D. Va. May 24, 2016) (denying defendants' motion for summary judgment on plaintiff's SCA claim based on plaintiff's inability to prove actual damages). Therefore, while 5Church cannot recover statutory damages, 5Church may be entitled to attorney's fees, and Kamel is not entitled to summary judgment on 5Church's SCA claim.[9]

---

[9] The issue of if and how the Court could apportion attorney's fees incurred solely with respect to 5Church's SCA claim based on Kamel taking the administrative rights to the email domains is deferred to another day.

6. <u>5Church's Claim Under the CFAA</u>

5Church's CFAA claim is based on Kamel implementing the email forwarding rule. (Doc. No. 62, at 27.) Kamel argues that he is entitled to summary judgment because 5Church's claim is time-barred. (Doc. No. 70, at 17–18.)

The CFAA prohibits any person from "intentionally access[ing] a computer without authorization or exceed[ing] authorized access, and thereby obtain[ing] . . . information from any protected computer." 18 U.S.C. § 1030(a)(2)(C). "The elements of a section 1030(a)(2) violation thus include (1) intentional access of a computer, (2) without or in excess of authorization, (3) whereby the defendant obtains information from the protected computer." <u>Motorola, Inc. v. Lemko Corp.</u>, 609 F. Supp. 2d 760, 766 (N.D. Ill. 2009). The CFAA provides a private right of action for "[a]ny person who suffers damage or loss by reason of a violation of [section 1030.]" 18 U.S.C. § 1030(g). The CFAA distinguishes between "damage" and "loss." "Damage" is defined as "any impairment to the integrity or availability of data, a program, a system, or information[.]" <u>Id.</u> § 1030(e)(8). "Loss" is defined as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service[.]" <u>Id.</u> § 1030(e)(11). A civil action under the CFAA must be brought "within 2 years of the date of the act complained of or the date of the discovery of the damage." <u>Id.</u> § 1030(g).

Kamel argues that 5Church has not come forward with any evidence of

"damage" and, thus, the statute of limitations is two years from "the date of the act complained of." (Doc. No. 70, at 17–18.) In response, 5Church does not address the distinction between "damage" and "loss" as it pertains to the statute of limitations. Instead, 5Church assumes that the limitations period runs from the date of discovery, rather than "the date of the act complained of," and argues that it did not discover Kamel's unauthorized access until January 2019. (Doc. No. 74, at 17–19.) The Court agrees with Kamel.

5Church has not come forward with any evidence of "damage" within the meaning of the CFAA and, as a result, the two-year statute of limitations runs from "the date of the act complained of" rather than "the date of discovery of the damage." Although 5Church has come forward with evidence that it incurred $4,750 in investigative costs, this amounts to "loss," not "damage." Animators at Law, Inc. v. Capital Legal Sols., LLC, 786 F. Supp. 2d 1114, 1120 (E.D. Va. 2011) (stating that "costs incurred as part of the response to a CFAA violation, including the investigation of an offense," constitute "loss"). 5Church has failed to come forward with any evidence of impairment to the integrity or availability of its system, data, program, or information. Accordingly, the statute of limitations on 5Church's CFAA claim runs from the date of the last act complained of. See State Analysis, Inc. v. Am. Fin. Servs. Assoc., 621 F. Supp. 2d 309, 316 (E.D. Va. 2009) (stating that "[b]ecause [plaintiff] has alleged that it has suffered only loss, but not damage, the statute of limitations for the CFAA claim began to run from the date of the defendants' alleged violations").

The evidence of record tends to show that the last date on which emails were automatically forwarded to Kamel's personal email address was December 1, 2016. (Doc. No. 76-9, ¶ 40.)  Although 5Church contends that Kamel created a subsequent forwarding rule that was not discovered until January 11, 2019, 5Church fails to point to any supporting record evidence.  Instead, 5Church cites to the allegations of its pleading, (Doc. No. 74, at 19), which is insufficient to defeat summary judgment, Allstate Fin. Corp. v. Financorp, 934 F.2d 55, 58 (4th Cir. 1991) ("[T]he party opposing a properly supported motion for summary judgment may not rest upon the mere allegations in his pleading but must set forth specific facts that show there is a genuine issue for trial.").  Thus, the statute of limitations began to run no later than December 1, 2016.  As 5Church did not seek to amend its complaint to assert a CFAA claim until more than two years later on February 7, 2019, 5Church's CFAA claim is time-barred and summary judgment in favor of Kamel is appropriate.[10]

### 7.    5Church's Claim for Conversion

5Church bases its conversion claim on Kamel taking the administrative rights to the 5Church email domains.  (Doc. No. 62, at 28.)  Kamel argues that he is entitled to summary judgment because administrative rights are intangible interests not subject to a conversion claim.  (Doc. No. 70, at 9.)

"Conversion is defined as 'an unauthorized assumption of the right of ownership over goods or personal chattels belonging to another, to the alteration of

---

[10] Having concluded that the claim is time-barred, the Court need not address Kamel's remaining argument that 5Church failed to establish loss aggregating at least $5,000.

their condition or the exclusion of an owner's rights.'" Norman v. Nash Johnson & Sons' Farms, Inc., 537 S.E.2d 248, 264 (N.C. Ct. App. 2000) (quoting Spinks v. Taylor, 278 S.E.2d 501, 506 (N.C. 1981)). "There are, in effect, two essential elements of a conversion claim: ownership in the plaintiff and wrongful possession or conversion by the defendant." Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC, 723 S.E.2d 744, 747 (N.C. 2012). A conversion claim does not apply to "intangible interests such as business opportunities and expectancy interests[.]" Norman, 537 S.E.2d at 264. "An intangible asset or interest is an asset that is not a physical object, such as a patent, a trademark or goodwill." Precision Components, Inc. v. C.W. Bearing USA, Inc., 630 F. Supp. 2d 635, 642 (W.D.N.C. 2008) (quotation marks omitted).

Here, 5Church claims that Kamel converted its administrative rights to the email domains. Such rights are intangible interests that may not be the subject of a conversion claim. See id. (holding a patent is an intangible asset and granting summary judgment in favor of defendant on plaintiff's conversion claim); Window World of N. Atlanta, Inc. v. Window World, Inc., 2018 NCBC LEXIS 111, at *9–10 (N.C. Super. Ct. Oct. 22, 2018) (holding contractual and trademark rights are intangible interests and dismissing plaintiff's conversion claim); Surratt v. Brown, 2015 NCBC LEXIS 75, at *16 (N.C. Super. Ct. July 27, 2015) (holding a right to partnership property and a right to participate in company management are intangible interests and limiting plaintiff's conversion claim to tangible assets). Therefore, Kamel is entitled to summary judgment on 5Church's conversion claim.

8.     5Church Charleston's Claim for Breach of the Duty of Loyalty

5Church Charleston alleges that Kamel breached his fiduciary duty of loyalty by implementing the email forwarding rule.  (Doc. No. 62, at 29–30.)  The parties argue this claim under North Carolina law; however, because 5Church Charleston is a South Carolina limited liability company, South Carolina law applies to 5Church Charleston's claim for breach of the duty of loyalty.  See Bluebird Corp. v. Aubin, 657 S.E.2d 55, 63 (N.C. Ct. App. 2008) ("The internal affairs doctrine is a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs—matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders—because otherwise a corporation could be faced with conflicting demands." (quoting Edgar v. MITE Corp., 457 U.S. 624, 645 (1982))); JS Real Estate Investors LLC v. Gee Real Estate, LLC, 2017 NCBC LEXIS 104, at *15 (N.C. Super. Ct. Nov. 9, 2017) (applying Delaware law to a breach of fiduciary duty claim brought by a member of a Delaware limited liability company against the manager); see also N.C. Gen. Stat. § 57D-3-21 (stating the fiduciary duties owed by a manager of a limited liability company organized under North Carolina law); S.C. Code Ann. § 33-44-409 (stating the fiduciary duties owed by a manager of a limited liability company organized under South Carolina law).

Under South Carolina law, "[t]o establish a claim for breach of fiduciary duty, the plaintiff must prove (1) the existence of a fiduciary duty, (2) a breach of that duty owed to the plaintiff by the defendant, and (3) damages proximately resulting from

the wrongful conduct of the defendant." <u>RFT Mgmt. Co. v. Tinsley & Adams L.L.P.</u>, 732 S.E.2d 166, 173 (S.C. 2012). South Carolina law specifically provides that a manager of a manager-managed limited liability company owes a duty of loyalty that is "limited to" the following:

> (1) to account to the company and to hold as trustee for it any property, profit, or benefit derived by the member in the conduct . . . of the company's business or derived from a use by the member of the company's property, including the appropriation of a company's opportunity;
>
> (2) to refrain from dealing with the company in the conduct . . . of the company's business as or on behalf of a party having an interest adverse to the company; and
>
> (3) to refrain from competing with the company in the conduct of the company's business before the dissolution of the company.

S.C. Code Ann. § 33-44-409(b), (h)(2).

Kamel, as the manager of 5Church Charleston, a manager-managed limited liability company, owed a duty of loyalty to 5Church Charleston as set forth in S.C. Code Ann. § 33-44-409(b). 5Church Charleston fails to explain, however, how implementing the email forwarding rule constitutes a breach of this duty. Moreover, the only evidence of damages related to the email forwarding rule is $4,750 in fees and expenses 5Church incurred in engaging Reliance, a digital investigation and cybersecurity firm, to investigate the email forwarding issue. 5Church does not cite any case to support the proposition that investigative costs constitute direct damages under South Carolina law, and the Court has not found such a case. Accordingly, Kamel is entitled to summary judgment on 5Church Charleston's claim for breach of the duty of loyalty.

9.    5Church's Claim for Injunctive Relief

Kamel moves for summary judgment on 5Church's claim for injunctive relief on the basis that the claim is moot, (Doc. No. 70, at 6), and 5Church agrees to the dismissal of this claim, (Doc. No. 74, at 5).  Therefore, the Court grants summary judgment in favor of Kamel on 5Church's claim for injunctive relief.

C.    **Defendants' Motion to Continue Trial Date**

A jury trial is set for September 3, 2019.  In its discretion, the Court grants Defendants' Motion to Continue Trial Date, (Doc. No. 85).  A jury trial is reset for November 4, 2019.

IV.    **CONCLUSION**

**IT IS THEREFORE ORDERED** that:

1.    Defendants' Motion for Summary Judgment, (Doc. No. 65), is **DENIED in part** and **GRANTED in part**.

a.    The Court denies Defendants' Motion for Summary judgment as to Kamel's breach of contract claim to the extent the claim is based on section 3.12(a).  Kamel's claim for breach of section 3.12(a) may proceed to trial.  But, the Court grants Defendants' Motion for Summary Judgment as to Kamel's breach of contract claim to the extent the claim is based on sections 3.12(b) and 3.12(c).  Kamel's claim for breach of sections 3.12(b) and 3.12(c) is **DISMISSED.**

b.    The Court denies Defendants' Motion for Summary Judgment as

to Kamel's claim for breach of fiduciary as to MAP. Kamel's claim for breach of fiduciary duty as to MAP may proceed to trial. But, the Court grants Defendants' Motion for Summary Judgment as to Kamel's claim for breach of fiduciary duty as to Whalen. Kamel's breach of fiduciary duty claim as to Whalen is **DISMISSED**.

c. The Court grants Defendants' Motion for Summary Judgment as to Kamel's claim for violation of N.C. Gen. Stat. § 75‑1.1. Kamel's claim for violation of N.C. Gen. Stat. § 75‑1.1 is **DISMISSED**.

2. Kamel's Motion for Partial Summary Judgment, (Doc. No. 69), is **DENIED in part** and **GRANTED in part**.

a. The Court grants Kamel's Motion for Partial Summary Judgment as to Whalen's and 5Church's fraud claims. Whalen's and 5Church's fraud claims are **DISMISSED**.

b. The Court grants Kamel's Motion for Partial Summary Judgment as to Whalen's and 5Church's claims under the North Carolina Securities Act. Whalen's and 5Church's claims under the North Carolina Securities Act are **DISMISSED**.

c. The Court grants Kamel's Motion for Partial Summary Judgment as to 5Church's claim for violation of N.C. Gen. Stat. § 75‑1.1. 5Church's claim for violation of N.C. Gen. Stat. § 75‑1.1 is **DISMISSED**.

d. The Court denies Kamel's Motion for Partial Summary Judgment as to 5Church's claim for computer trespass.  5Church's claim for computer trespass may proceed to trial.

e. The Court denies Kamel's Motion for Partial Summary Judgment as to 5Church's claim for violation of the SCA to the extent the claim is based on taking the administrative rights to the email domains.  5Church's SCA claim based on taking the administrative rights to the email domains may proceed to trial.  But, the Court grants Kamel's Motion for Partial Summary Judgment as to 5Church's claim for violation of the SCA based on the email forwarding rule.  5Church's SCA claim based on the email forwarding rule is **DISMISSED**.

f. The Court grants Kamel's Motion for Partial Summary Judgment as to 5Church's claim for violation of the CFAA.  5Church's CFAA claim is **DISMISSED**.

g. The Court grants Kamel's Motion for Partial Summary Judgment as to 5Church's claim for conversion.  5Church's conversion claim is **DISMISSED**.

h. The Court grants Kamel's Motion for Partial Summary Judgment as to 5Church Charleston's claim for breach of the duty of loyalty.  5Church's Charleston's claim for breach of the duty of loyalty is **DISMISSED**.

i. The Court grants Kamel's Motion for Partial Summary Judgment as to 5Church's claim for injunctive relief. 5Church's claim for injunctive relief is **DISMISSED**.

3. Defendants' Motion to Continue Trial Date, (Doc. No. 85), is **GRANTED**. A jury trial is reset for November 4, 2019.

| Claims Proceeding to Trial | |
|---|---|
| **Claimant** | **Claim** |
| Kamel | Breach of section 3.12(a) |
| Kamel | Breach of fiduciary duty against MAP |
| Kamel | Equitable accounting[11] |
| 5Church | Computer trespass |
| 5Church | Violation of the SCA based on taking the administrative rights to the email domains |

Signed: August 23, 2019

Robert J. Conrad, Jr.
United States District Judge

---

[11] The Court is unsure whether Kamel has abandoned this claim, and the parties did not move for summary judgment as to this claim.